**RECORD IMPOUNDED**

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court."
Although it is posted on the internet, this opinion is binding only on the
parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-4900-16T1
             A-4901-16T1

NEW JERSEY DIVISION OF CHILD
PROTECTION AND PERMANENCY,

    Plaintiff-Respondent,

v.

A.S.C. and W.L.-R.,

    Defendants-Appellants.

_____

IN THE MATTER OF THE GUARDIANSHIP
OF M.L.-C. and W.J.L.-C., Minors.

_____

Submitted May 31, 2018 — Decided July 9, 2018

Before Judges Haas, Rothstadt and Gooden
Brown.

On appeal from Superior Court of New Jersey,
Chancery Division, Family Part, Essex County,
Docket No. FG-07-0154-17.

Joseph E. Krakora, Public Defender, attorney
for appellant A.S.C. (Albert M. Afonso,
Designated Counsel, on the brief).

Joseph E. Krakora, Public Defender, attorney
for appellant W.L.-R. (Victor E. Ramos,
Assistant Deputy Public Defender, of counsel
and on the briefs).

Gurbir S. Grewal, Attorney General, attorney for respondent (Jason W. Rockwell, Assistant Attorney General, of counsel; Lisa Cerasia, Deputy Attorney General, on the brief).

Joseph E. Krakora, Public Defender, Law Guardian, attorney for minors (Noel C. Devlin, Assistant Deputy Public Defender, of counsel and on the brief).

PER CURIAM

In these back-to-back appeals, which we consolidate for purposes of issuing a single opinion, defendants A.S.C.[1] (mother) and W.L.-R. (father), a married couple, appeal from the June 30, 2017 judgment of guardianship that terminated their parental rights to their daughter, M.L.-C., born in May 2014, and son, W.J.L.-C., born in August 2015. A.S.C.[2] argues that plaintiff New Jersey Division of Child Protection and Permanency (Division) failed to prove each prong of the "best interests" standard codified in N.J.S.A. 30:4C-15.1(a) by clear and convincing evidence, and the trial court failed to adequately consider her status as a victim of domestic violence under each prong. W.L.-R. argues the "court's factual findings as to prong[s] one and three" are erroneous because the record does not support a finding

---

[1] Pursuant to Rule 1:38-3(d), we use initials to protect the confidentiality of the participants in these proceedings.

[2] A.S.C. has three older children with different fathers. None of those children were in her care or involved in this appeal.

that the children were harmed, and the Division failed to address his psychotherapeutic needs as well as the merits of a best interest rule out, and improperly suspended his visitation. The Law Guardian supported termination before the trial court and, on appeal, joins the Division in urging us to affirm. Having considered the parties' arguments in light of the record and applicable legal standards, we affirm.

N.J.S.A. 30:4C-15.1(a) requires the Division to petition for termination of parental rights on the grounds of the "best interests of the child" if the following standards are met:

> (1) The child's safety, health, or development has been or will continue to be endangered by the parental relationship;
>
> (2) The parent is unwilling or unable to eliminate the harm facing the child or is unable or unwilling to provide a safe and stable home for the child and the delay of permanent placement will add to the harm[3] . . . ;
>
> (3) The [D]ivision has made reasonable efforts to provide services to help the parent correct the circumstances which led to the child's placement outside the home and the court has considered alternatives to termination of parental rights; and
>
> (4) Termination of parental rights will not do more harm than good.

---

[3] "Such harm may include evidence that separating the child from his resource family parents would cause serious and enduring emotional or psychological harm to the child." N.J.S.A. 30:4C-15.1(a)(2).

On December 20, 2016, the Division filed a verified complaint to terminate defendants' parental rights and award the Division guardianship of M.L.-C. and W.J.L.-C. Judge Nora J. Grimbergen conducted a three-day guardianship trial, during which the Division presented the testimony of caseworkers Marisol Ortega and Diana Trail, both of whom detailed the Division's involvement with defendants beginning in 2014, as well as Dr. Antonio Burr, the Division's expert in the field of forensic psychology who conducted psychological and bonding evaluations at the Division's request. In addition, numerous documentary exhibits were admitted into evidence.

We will not recite in detail defendants' extensive history of domestic violence and substance abuse that, despite W.L.-R.'s persistent denials, resulted in the Division referring A.S.C. to a domestic violence shelter on at least three separate occasions and A.S.C. obtaining numerous temporary restraining orders (TRO) against W.L.-R. On one occasion, A.S.C.'s injuries were so severe that she appeared at the Division's office in a wheelchair with a full-length brace on one leg and bruises on her face, arms, back and buttock. Initially, A.S.C. claimed that she had fallen in the bathtub but later confided in a domestic violence liaison that W.L.-R. had beaten her and that the abuse had been ongoing since

2014.  She expressed fear that W.L.-R. would kill her and reported that after the children were born, they witnessed the violence and had problems sleeping.  Nonetheless, after each incident, A.S.C. ultimately left the shelter, dismissed the restraining order, reconciled with W.L.-R., and resumed their turbulent relationship.  Because neither defendant was employed, they survived on W.L.-R.'s supplemental social security income.

On January 16, 2015, after A.S.C. left the domestic violence shelter the first time, the Division obtained custody of M.L.-C., then two-years-old, based on the Division's continued concerns about domestic violence and alcohol abuse by both defendants.  The Division referred both defendants for substance abuse assessments, psychological evaluations, and parenting skills education.  In addition, A.S.C. was referred for domestic violence counseling and W.L.-R. was referred to a batterer's intervention program.  Because of their compliance with the services, the Division returned M.L.-C. to defendants' custody on May 27, 2015.  However, the Division provided in-home counseling and a parent aide due to continued concerns about domestic violence between the couple.

After W.J.L.-C. was born in August 2015, defendants separated again and obtained reciprocal TROs against each other.  W.L.-R.'s TRO against A.S.C. was due to "her aggressive behavior toward him

in front of the children"[4] and A.S.C.'s TRO against W.L.-R. was based on allegations that he had threatened to beat her and cut her into pieces. On October 2, 2015, W.L.-R. was granted physical custody of both children by court order under the non-dissolution ("FD") docket, which order required that A.S.C.'s visitation with the children be supervised. Ultimately, the parties reconciled. However, amidst new allegations of domestic violence[5] and substance abuse[6] by W.L.-R., as well as concerns about his care of M.L.-C., a special needs child whose occupational therapy had been terminated due to W.L.-R's repeated cancellation of her appointments, the Division executed an emergency removal of both children on November 20, 2015, due to continued concerns about their safety.

Initially, M.L.-C. was placed in St. Clare's Home for Children and remained there until September 2016, when she was placed along with W.J.L.-C. with a resource parent who was a family friend

---

[4]  The trial court later determined that W.L.-R.'s allegations of domestic violence were unsubstantiated and dismissed his TRO.

[5]  In November 2015, there was an allegation that during a verbal altercation, W.L.-R. barricaded A.S.C. in a room in front of the children and M.L.-C.'s therapist, and snatched W.J.L.-C. from A.S.C.'s arms during the ensuing scuffle.

[6]  In October 2015, W.L.-R. tested positive for cocaine and was referred for treatment which he did not complete. Although W.L.-R. claimed his noncompliance was due to his hospitalization, he never provided any documentation to support his claim.

A-4900-16T1

identified by W.L.-R. Both caseworkers observed good interaction and affection between the resource parent and the children and were satisfied with the care the children were receiving, particularly M.L.-C. who was attending all her doctors' appointments. During the course of the protective services and guardianship litigation, the Division assessed a total of seven family members and friends identified by defendants as potential caregivers for the children, but none were viable options. Five were ruled out for reasons personal to them, and W.L.-R.'s two paternal cousins who were identified later in the litigation were ruled out based on the best interests of the children because the Division's expert recommended against removing the children from their resource parent at that time.

After the children were removed from defendants, the Division referred defendants for psychological evaluations as well as couples and individual counseling. W.L.-R. was also referred for substance abuse treatment and A.S.C. was referred for another substance abuse assessment. However, defendants failed to complete any of the programs and were discharged. W.L.-R. never completed the intake for substance abuse treatment, claiming he needed emergency surgery for which he provided no documentation, and A.S.C. failed to appear for her assessment. A.S.C. explained to Ortega that she did not complete her individual counseling to

address past sexual abuse, domestic violence and parenting skills because her therapist urged her to leave W.L.-R, which she refused to consider. On July 14, 2016, both defendants enrolled themselves at the Lennard Clinic for substance abuse treatment. Despite producing diluted urine samples, A.S.C. tested positive for alcohol, cocaine and opiates, and was recommended for inpatient treatment. W.L.-R. tested positive for alcohol and opiates and was admitted into the Opioid Maintenance Outpatient Treatment Program. However, on September 22, 2016, both defendants were incarcerated and did not complete their treatment.[7]

As to visitation, according to Ortega, A.S.C. was consistent with visitation "for the most part" but smelled of alcohol during a number of the visits, had difficulty handling both children at the same time, and brought the children inappropriate snacks despite being cautioned. W.L.-R.'s visitation was suspended following a February 12, 2016 incident, during which W.L.-R. became verbally aggressive and attempted to prevent Ortega from leaving his home by blocking the elevator door from closing once she was inside. Ortega had gone to W.L.-R.'s home for a family team meeting. However, during the meeting, W.L.-R.'s only concern was

---

[7] The reason for the incarceration is unclear in the record. W.L.-R. was released on November 5, 2016, but did not notify the Division until December 7, 2016. At the time of the guardianship trial, A.S.C. was still in custody.

A.S.C.'s whereabouts and he accused the Division of "taking her side," showing Ortega empty alcohol bottles he claimed A.S.C. had drank and empty heroin baggies he claimed he and A.S.C. had used. Due to his demeanor and actions during the meeting, the Division obtained court approval to suspend W.L.-R.'s visitation based on worker safety concerns. Thereafter, his visitation was reinstated, and in October 2016, while both defendants were incarcerated, the Division arranged visitation with the children at the jail. After W.L.-R. was released from jail, his visitation was reportedly consistent and appropriate.

On November 4, 2016, the permanency goal was changed from reunification to adoption due to defendants' failure to comply with services. Dr. Burr conducted psychological and bonding evaluations of W.L.-R. on March 21 and A.S.C. on March 24, 2017. He also conducted a bonding evaluation with the resource parent on March 21, 2017. Dr. Burr opined that both parents had a decreased capacity to parent and provided an unacceptable risk of harm to the children. From a psychological perspective, he concluded that it would be in the children's best interests for defendants' parental rights to be terminated, and for the children to be adopted by the resource parent, in order for the children to achieve permanency with a parent who was able to provide them

A-4900-16T1

with a secure and caring environment that would enable them to focus on their developmental tasks.

After administering psychometric tests, Dr. Burr noted that A.S.C., who had a fifth grade education, had limited insight and poor reasoning, social comprehension and judgment. Dr. Burr described A.S.C. as "clinically fragile" and vulnerable to dependency based on her history, which included being gang-raped as a teenager and drinking at an early age. According to Dr. Burr, A.S.C. suffered from dependent personality disorder, which manifested itself with a pervasive and excessive need to be taken care of that lead to submissive behaviors and fears of separation. Dr. Burr concluded that A.S.C.'s cognitive and adaptive disabilities limited her ability to parent effectively and that she could not be independent and leave the relationship with W.L.-R. even to protect herself and her children. Dr. Burr opined that even if she severed her relationship with W.L.-R., she did not have the intellectual or adaptive capacity to parent independently and no further services the Division could offer would result in substantial change.

Regarding the bonding evaluation, Dr. Burr opined that there was no "poignancy" between A.S.C. and the children and that the children's attachment to her was "indifferent," in that they showed no behaviors towards her as a primary parental figure from whom

10

they expected to receive care or nurturing. Dr. Burr acknowledged that A.S.C. was affectionate towards the children, able to keep them engaged for the fifty-minute evaluation, and there was no evidence of aversion, major problems or rejection. However, according to Dr. Burr, overall, A.S.C. did not engage the children in a manner that showed she understood their level of development and had no real appreciation for M.L.-C.'s special needs.

As to W.L.-R., Dr. Burr testified that he was not a reliable historian as his narrative fundamentally differed from the data in the record, particularly his denial of domestic violence and substance abuse despite multiple corroborated instances. Although Dr. Burr acknowledged W.L.-R.'s completion of a batterers' intervention program, based on his persistent denials, Dr. Burr found little value in his completion of the program and a risk that the domestic violence, which posed the most significant risk to the children, would continue. Likewise, Dr. Burr found W.L.-R.'s completion of substance abuse treatment indicative of remission, not rehabilitation, thus posing a risk for future substance abuse.

Dr. Burr noted that because W.L.-R.'s psychological needs were primarily focused on protecting his own dignity and self-respect, he would rather risk permanent separation from his children than admit he engaged in problematic behaviors and was

A-4900-16T1

unable to visualize or conceptualize the needs of his children taking precedence over his own. As such, according to Dr. Burr, W.L.-R. was unable and unprepared to address the special developmental needs of his children. Dr. Burr opined that there were no services that could be offered to W.L.-R. that would change him sufficiently to be able to parent his children because, while loss was normally a motivator, W.L.-R. had displayed no substantive change in his attitude since his children's removal.

Regarding the bonding evaluation, Dr. Burr opined that the children's attachment to W.L.-R. was "ambiguous," as they did not see him as a primary parental figure from whom they expected the satisfaction of their needs. In particular, M.L.-C. displayed a "significant aversion" towards W.L.-R., showing a mistrust that Dr. Burr indicated was evidence of no bond at all. Although Dr. Burr noted that W.L.-R. appropriately directed and organized the children's play, neither child sought to be physically close to him nor did either call him by a discernible name.

In contrast, Dr. Burr opined that the children have developed a significant secure attachment to their resource parent, whom they view as a primary parental figure in their lives. Dr. Burr observed M.L.-C.'s demeanor to be engaging and W.J.L.-C.'s demeanor to be responsive to the resource parent, seeking comfort from her. Acknowledging that not all severing of relationships

12

for a child under two years of age are harmful, Dr. Burr noted that there is always a dimension of loss. Dr. Burr opined that if the children stayed with the resource parent, they would enjoy a secure environment and their development would progress. However, if the children were removed, there would be a significant disruption, but it would be impossible to predict how each child would react specifically.

On the other hand, Dr. Burr testified that if the children were reunited with defendants, it would be in an insecure and stressful environment and the children would have to work to adapt and survive in that deleterious environment. Moreover, given the secure attachment the children have developed with their resource parent, neither defendant would be able to mitigate the loss of that relationship, while the quality of the resource parent's nurturing would likely "substantially mitigate" any sense of loss the children might experience if the relationship with defendants was severed. Dr. Burr concluded that for the children to be safe, they should be permitted to achieve permanency with their resource parent because the longer children have ambiguity and insecurity, the more harm it will do.

Following the trial, on June 30, 2017, Judge Grimbergen issued a written decision in which she determined the Division had proven, "clearly and convincingly," all four prongs of the best interests

standard.  Preliminarily, the judge found the Division's witnesses credible.  Turning to the first two prongs, which the judge acknowledged were "interrelated and overlapping," Judge Grimbergen was satisfied that defendants "have continued to harm the children's safety, health and development by failing to address the issues relating to domestic violence and substance abuse[,] causing further delay in permanency for [the children]."  Further, the judge concluded that "[t]o deny [the children] permanency in the hope that [defendants] can become stable parents in light of their failure to change their behavior is not in the children's best interests."

Noting that the children were removed for the same issues that led to M.L.-C.'s removal before W.J.L.-C. was born, the judge explained that

> [A.S.C.] has refused to separate herself from [W.L.-R.] and has not resolved the negative impact her failure to do so has on the children.  The Division has made multiple attempts to help [A.S.C.] separate from [W.L.-R.] since the inception of the litigation in September of 2014.  Despite the referrals to shelters and domestic violence liaisons, [A.S.C.], by her actions, has made it clear that she has no intention of leaving [W.L.-R.].  Each time she leaves the home, she returns, subjecting herself to further abuse.  She has expressed fear of [W.L.-R.] not only for herself on multiple occasions, but for her children as well.  Even if she was to successfully separate from [W.L.-R.], the uncontroverted testimony from Dr. Burr is that

14

> [A.S.C.] is not capable of parenting these
> children on her own.

In addition, given A.S.C.'s acknowledgement "that alcohol was part of what led to the domestic violence[,]" the judge found it significant that A.S.C.'s long-term substance abuse issues persisted as evidenced by her positive test results while attending the Lennard Clinic. The judge determined that the record was clear that "[A.S.C.] cannot protect herself and her children from domestic violence," and "has not benefitted from domestic violence and individual counseling, or shelter placements despite being given numerous opportunities." Relying on <u>N.J. Div. of Youth & Family Servs. v. F.M.</u>, 211 N.J. 420 (2012) and <u>N.J. Div. of Youth & Family Servs. v. M.M.</u>, 189 N.J. 261 (2007), as well as Dr. Burr's testimony "that the most significant risk factor to these children is the domestic violence," the judge concluded that "[e]ven as a victim of domestic violence, failure to protect oneself and one's children satisfies [p]rong [o]ne."

Regarding W.L.-R., the judge also found that "[t]he Division had provided him with numerous services with little effect" "because of his refusal to acknowledge that domestic violence and substance abuse are issues." According to the judge, because the children have reportedly witnessed the violence, "[W.L.-R.'s] repeated denials and blaming [A.S.C.], coupled with the number of

events set forth in the evidence[,] highlights the potential danger [W.L.-R.] presents to the children's safety, health and development." The judge concluded that despite the fact that "for the most part[,] during visitations, both [defendants] were appropriate," "[t]he larger picture over time since September 2014 when the Division became involved shows that neither [defendant] [has] meaningfully and consistently engaged in services which has impaired their ability to care for the children and continues to contribute to the risk of harm."

Turning to prong three, the judge determined that the Division provided "reasonable efforts to help [defendants] correct the circumstances that led to [the children's] removals[,] including psychological evaluations, [substance abuse] assessments, substance abuse treatment, individual therapy, family therapy, parenting skills, visitation, housing assistance, shelter placement and domestic violence counseling." The judge noted that sufficiency of the Division's efforts was "not measured by whether they ultimately resulted in success or failure," but rather their "adequacy in light of all the circumstances of the given case." While acknowledging that both defendants participated in services, the judge determined that "neither of them advanced such that they could viably parent the children despite those services."

16

To further support her conclusion, the judge relied on Dr. Burr's testimony that "no additional services that the Division could offer . . . would change [defendants'] behavior as those services have already been offered and none of them have resulted in the necessary change in either parent." The judge also determined that "the Division considered alternatives to adoption" by assessing "[a] multitude of family members . . . as options." However, "unfortunately, none of them were able to fulfill a caretaker role for both [children]."

Finally, as to prong four, the judge acknowledged that under the case law, "a child's need for permanency outweighs protracted efforts to have the biological parents become viable parenting options." Further, quoting In re Guardianship of K.H.O., 161 N.J. 337, 355 (1999), the judge noted that recent legislation "permits termination of parental rights 'where a child has been in placement for more than one year and the family has failed to remedy the problems that caused the placement despite the Division's diligent efforts.'"

The judge then determined that the children "will suffer greater harm from the termination of their relationship with their resource parent than they would from a termination of their relationship with their biological parents." "Based on Dr. Burr's uncontroverted expert opinion and the other competent evidence in

the record," the judge was satisfied "that terminating defendants' parental rights to [the children] would not do more harm than good." The judge elaborated:

> Here we have two parents who have demonstrated over the course of [two-and-one-half years that they are incapable of changing their behavior, even if it means the loss of their children. [W.L.-R.] refuses to admit he engages in domestic violence. [A.S.C.] refuses to commit to leaving [W.L.-R.] so that her children could possibly be returned to her. Neither parent has successfully addressed their substance abuse issues. It is true that they both have been consistent with visitation, thus maintaining the connection to their children. However, their failure to remedy the issues which caused the children to be removed after this length of time cannot be ignored.

The judge acknowledged that "[t]here [was] no dispute that the children have an attachment with both [defendants]." However, relying on Dr. Burr's psychological and bonding evaluations, the judge concluded if the relationship with defendants was severed, the resource parent would "substantially mitigate any sense of loss." Whereas "the effect of a failed reunification for [W.J.L.-C.] and a second for [M.L.-C.] would be one more disruption for both children." The judge agreed with Dr. Burr that reunification posed an unacceptable risk of harm to the children because they would "have to adapt to a violent or disruptive environment." The judge concluded that the children needed "the safe and stable

permanency their resource parent [could] provide" and was satisfied that it was in their "best interest to terminate [defendants'] parental rights" to "allow for that permanency." The judge entered a memorializing order, and this appeal followed.

Our scope of review on appeals from orders terminating parental rights is limited. In such cases, we will generally uphold the trial court's findings, so long as they are supported by "adequate, substantial, and credible evidence." N.J. Div. of Youth & Family Servs. v. R.G., 217 N.J. 527, 552 (2014). The decision should only be reversed or altered on appeal if the trial court's findings were "so wholly unsupportable as to result in a denial of justice." N.J. Div. of Youth & Family Servs. v. P.P., 180 N.J. 494, 511 (2004) (quoting In re Guardianship of J.N.H., 172 N.J. 440, 472 (2002)).

Likewise, we must give substantial deference to the family court judge's special expertise and opportunity to have observed the witnesses firsthand and evaluate their credibility. R.G., 217 N.J. at 552-53. Moreover, as the fact finder, while the "trial judge is 'not required to accept all or any part of [an] expert opinion,'" he or she may "place[] decisive weight on [the] expert." In re Civil Commitment of R.F., 217 N.J. 152, 156, 174 (2014) (first alteration in original). Even where, as here, the appellants allege "error in the trial judge's evaluation of the

underlying facts and the implications to be drawn therefrom," deference must be afforded unless the judge "went so wide of the mark that a mistake must have been made." M.M., 189 N.J. at 279 (first quoting In re Guardianship of J.T., 269 N.J. Super. 172, 188-89 (App. Div. 1993); then quoting C.B. Snyder Realty, Inc. v. BMW of N. Am. Inc., 233 N.J. Super. 65, 69 (App. Div. 1989)).

Guided by these standards, we conclude that Judge Grimbergen's factual findings are amply supported by the credible evidence in the record, and her legal conclusions are unassailable. "It is not our place to second-guess or substitute our judgment for that of the family court, provided that the record contains substantial and credible evidence to support the decision to terminate parental rights." F.M., 211 N.J. at 448-49.

Here, the judge reviewed the evidence presented at trial, made detailed findings as to each prong of N.J.S.A. 30:4C-15.1(a), and concluded that the Division met by clear and convincing evidence all of the legal requirements for a judgment of guardianship. The judge's opinion tracks the statutory requirements of N.J.S.A. 30:4C-15.1(a) and accords with applicable case law. See, e.g., F.M., 211 N.J. at 447-54; N.J. Div. of Youth & Family Servs. v. E.P., 196 N.J. 88, 103-07 (2008); K.H.O., 161 N.J. at 347-63; In re Guardianship of D.M.H., 161 N.J. 365, 375-93 (1999). We thus affirm substantially for the reasons Judge

Grimbergen expressed in her well-reasoned written opinion and, like the judge, find defendants' arguments unavailing.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-4900-16T1